IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                                    CRIMINAL 06-0265 (JAG)

HÉCTOR VÉLEZ-RODRÍGUEZ, AKA
"PITO,"

Defendant

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On August 16, 2006, the defendant was indicted by a grand jury charging him as follows: "On or about August 9, 2006, in the District of Puerto Rico and within the jurisdiction of this Court, HÉCTOR VÉLEZ-RODRÍGUEZ, AKA "PITO," the defendant herein, did knowingly or intentionally possess with intent to distribute fifty (50) grams or more of a mixture or substance containing a detectable amount of cocaine base, a Schedule II Narcotic Controlled Substance." (Docket No. 10.)  The defendant moved to suppress the evidence seized on August 9, 2006 on November 7, 2006.  (Docket No. 27.)  The United States opposed the motion on November 13, 2006.  (Docket No. 32.)  I issued a report and recommendation denying the motion to suppress on April 11, 2007.  (Docket No. 41.)  The defendant objected to the same two days later.  (Docket No. 42.)  The court issued an order for the defendant to make a substantial preliminary showing that he is entitled to a hearing.  (Docket No. 43.)  The defense having complied

CRIMINAL 06-0265 (JAG)                    2

with the court's directive, the court issued a memorandum and order on May 14, 2007 allowing for an evidentiary hearing.  (Docket No. 46.)  The hearing was first scheduled for June 5, 2007, and then reset for July 17, August 24, October 29, December 27, 2007, and finally January 9, 2008.

The Standard Under Franks v. Delaware

The Fourth Amendment of the United States Constitution states that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Supreme Court's decision in Franks v. Delaware, 438 U.S. 154 (1978), established for the first time, the right of a criminal defendant to a hearing to attack under the Fourth Amendment, the statements contained in an affidavit submitted in support of a request for a search warrant.  A Franks hearing "is primarily a vehicle for challenging a warrant by impeaching the affiant." United States v. Adams, 305 F.3d 30, 36 n.1 (1st Cir. 2002).  In Franks, the Court held that a defendant is entitled to a hearing to challenge the truthfulness of statements given in support of a search warrant "if he [or she] makes a substantial preliminary showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth,

CRIMINAL 06-0265 (JAG)                3

and (2) the falsehood was necessary to the finding of probable cause." United States v. Strother, 318 F.3d 64, 69 (1st Cir. 2003) (citing Franks v. Delaware, 438 U.S. at 171-72).  Only when such a preliminary showing is made is the defendant entitled to a hearing.  See United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002); United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002).  If at the hearing, the defendant successfully establishes by a preponderance of the evidence the allegations of perjury or reckless disregard, and, in the event that, with the false statements set to one side, the remaining contents are insufficient to establish probable cause, the warrant must be voided and the fruits of the search excluded. Franks v. Delaware, 438 U.S. at 156.

As noted, there are two components to any Franks v. Delaware analysis. First is the threshold showing that a defendant has to make of his entitlement to a hearing.  If no such showing is made, then the court needs to go no further and the validity of the warrant and search must be upheld.  Second, (assuming a hearing is granted), is the substantive showing that a defendant has to make to establish the falseness of the statements given.  Such analysis, however, always begins with a presumption of the validity of the warrant.  Id. at 171.  In this case, my discussion is limited to the second prong of Franks, for it has clearly been established to the court that the defendant has made a preliminary showing of entitlement to a hearing.

CRIMINAL 06-0265 (JAG)                    4

### The Affidavit of Police Officer Rey I. Martínez Nieves

Officer Rey Martínez Nieves submitted an affidavit in support of his application for the search warrant at issue on August 9, 2006.  According to the affidavit, a telephone call was received at headquarters in Guayama related to an apartment located in Arroyo, on Road No. 3 at the intersection of Road No. 178, where some apartments are located.  The building is dark and light peach in color, and the apartment is located on the first floor.  Such apartment is being used to store and distribute controlled substances.  The person involved is light dark-skinned, tall, fat and is using a Ford F-150 pickup, wine color bearing license plate 588-787, extended cab, for the enterprise.  People come to the front of the apartment and the person sells to them at anytime of the day or night.  The apartments are located behind Toñito Auto Sales in Arroyo.

On August 5, 2006, Officer Martínez Reyes had the 6:00 P.M. to 2:00 A.M. shift at work at the drug division and he took an official confidential vehicle, binoculars, and portable radio and went to the location.  He arrived at Arroyo at 6:45 P.M. and went to a strategic location where he could see the building in plain view and at about 6:55 P.M. he saw a pickup truck arrive which fit the above description, and which parked in front of the building.  An individual with the above description wearing a green T-shirt and black jeans gets out of the vehicle and goes to the black door of the house, next to the stairwell, and enters the

CRIMINAL 06-0265 (JAG)                    5

house.  At about 7:05 P.M., a white, slim man wearing a red hat, red T-shirt and short blue jeans arrives on foot and stands in front of the apartment next to the stairs, and the man in the green shirt  comes out and they greet each other.  The man in the red hat reaches into his pants pocket and takes out a stack of bills and gives them to the man in the green T-shirt who puts the bills in his front pants pocket and returns to the Ford pickup.  He bends down at the passenger side and takes out a large white supermarket plastic bag and from that bag he takes out a large transparent bag with a green leafy material which appears to be marijuana.  The man in the red hat takes the bag and places it in his belt, and leaves on foot towards Road No. 3 in the direction of Guayama.  The man in the green T-shirt then returns to the Ford pickup and then enters the apartment.  At about 7:30 P.M. there arrives on foot from the direction of Arroyo a white man, medium built, wearing a brown shirt and long blue jeans.  He knocks on the door to the apartment and the man in the green T-shirt comes out of the apartment. They talk.  The first man gives the man in the green T-shirt some bills.  This man then enters the apartment and returns with a transparent bag which contains a number of plastic bags containing white powder which appears to be cocaine.  The first man then takes the bag and puts it in his pocket and leaves toward Arroyo on foot.  The surveilling agent then leaves his spot and reports to his senior officer.

CRIMINAL 06-0265 (JAG)                6

On August 7, 2006, agent came on duty at noon until 8:00 P.M.  He returned to the same location at about 12:45 P.M.  At about 1:20 P.M., the officer observed the same pickup arrive with the  same driver as before.  It parks in front of the building.  The driver exits the vehicle, enters the apartment, returns to the vehicle, takes out a big transparent bag with marijuana, closes the vehicle door, and returns to the apartment.  At about 1:45 P.M., a dark, fat man arrives, the driver exits the apartment, opens the door to the pickup, takes out a transparent bag with apparent cocaine, gives it to the pedestrian while the driver reenters the apartment.  At 2:20 P.M., another man comes to the apartment on foot, the driver comes out, and this pedestrian gives the driver some bills.  The driver then gives the man a bag of apparent marijuana.  The pedestrian takes it, places it in his waistband and walks toward Arroyo.  The driver returns to his apartment.  The officer then leaves the scene.

At the evidentiary hearing held on January 9, 2008, the defense called Rey I. Martínez Nieves, badge No. 27958, an officer with the Police of Puerto Rico for about nine years.  In 1999, Officer Martínez entered the police department and graduated from the Police Academy after about one year, in 2000.  He received training in civil rights courses, penal code, identification of controlled substances, analysis of information, and after he reported to the drug division he studied drug analysis and identification, and controlled substance  courses taught by Customs,

CRIMINAL 06-0265 (JAG)                    7

the NIE and the FBI.  He was then assigned to the  Manuel A. Pérez, Hato Rey East Division.  In August 5, 2006, Officer Martínez received a complaint that he had to look into in the town of Arroyo.  A telephone call had been received by someone (at headquarters) and someone wrote the information down.  Officer Martínez received the piece of paper some days before he went to investigate the complaint.  A supervisor told him to investigate the complaint.

Officer Martínez related the procedure of confidential calls is that one takes note of the call and a note is given to the person looking into the complaint.  Some of those notes are logged in a special book called "special complaints."  Sometimes it is logged and sometimes the paper is handed over to an officer without being logged.  This particular complaint was not placed in the "special complaints" book.  The ones in the book are handed to the agents in the form of a complaint with a memo.  The person that decides whether to log the call could be the person who took down the complaint.  The orders have numbers.  Having been told to investigate, Officer Martínez went to the place in the town of Arroyo with a confidential radio and vehicle, both property of the Police of Puerto Rico, and carried out a surveillance.  He later wrote a sworn statement on the 9th or 10th of August when he swore to the search warrant.  He testified that he had taken notes, after he made certain observations, and maybe still had those notes but could not be sure.  He had dictated the information to one of the secretaries.

CRIMINAL 06-0265 (JAG)                    8

Referring to Exhibit A (the search warrant for the vehicle), after reviewing the sworn statement of August 5, 2006, (there was a second surveillance of August 7, 2006), the officer noted that he went to the locale in the government vehicle in the town of Arroyo, between Road No. 3 and Road No. 178.

On August 5, 2006, the officer arrived at the area at about 6:45 P.M. and witnessed what he believed was a drug transaction at 7:05 or 7:10 P.M.  He witnessed a second transaction at about 7:20 or 7:30 P.M.  His testimony at the hearing regarding his observations fairly mirrors the sworn statement which supported the search warrants.  In the first transaction, the man in the red cap took the drugs, lifted his T-shirt and put them inside his waistband.  The man in the green T-shirt then went inside the pickup truck, and then went inside the house while the man in the red T-shirt left the place taking Road No. 3 towards Guayama.

Officer Martínez saw a similar transaction occur at about 7:20 P.M. so he decided to conduct another surveillance on a different date and left, returning on August 7, 2007, when more or the less the same thing that occurred on August 5 happened.  With the information he had from his observations, he went to the judge where he made a statement and the judge gave him a search warrant for the subject apartment and for the Ford pickup.  Officer Martínez then took the warrants to his supervisor who decided to execute the search warrants.  Officer

CRIMINAL 06-0265 (JAG)                    9

Martínez did not recall when the warrants were actually executed although they were executed at about noon.   He did not remember how many agents participated in the execution of the warrants.

Officer Martínez is not aware of any directive from the drug division in relation to how many surveillances are needed to support a warrant.

On cross-examination, officer Martinez said that on August 5, 2006, it was the first time he had seen the defendant, and that it is not a requirement of the Police of Puerto Rico to have two surveillances to obtain a search warrant.  If one observation is enough would depend on the discretion of the judge.

When the warrant was executed, there were many agents.  Officer Martínez himself left the area once the defendant was arrested.   An inventory was made of the substance but he did not make the inventory and had nothing to do with it.

Officer Martínez noted that all of the special events are to be logged by the agent but it is possible that the complaint is not logged into the book.  In six and a half to seven years, he has been on innumerable surveillances and applied for innumerable search warrants.  The policy for executing the search warrant is that any agent can execute it but for the purity of the matter, another agent executes the search warrant.   He does not known of any directives as to how many surveillances are needed to request a search warrant.

CRIMINAL 06-0265 (JAG)                    10

Miguel A. Rivera Morales testified that he is a contractor and lives in Arroyo. He knows the defendant because his wife was his neighbor and he and she grew up together.  (The defendant and his wife had a tile business.)  On August 5, 2006, Mr. Rivera saw the defendant since he, Mr. Rivera,  organized a horseback riding event in which the riders left at about 1:30 P.M.  There were perhaps 12, 15, or 20 people.  He remembered most of them, Carli Nandi, Chinito, Héctor Vélez, Miguelo.  They began at  the front of the El Cerezo business at Marín ward in Arroyo, at the entrance to the Ancona ward.  They left from there on horseback and two vehicles, one with food and beverages and in the other one a nephew went with Mr. Rivera's mother.  During this event, they made stops after a certain distance, to rest and have the animals rest, and to have a beer or two.  They stopped at Cala Abajo ward, in front of a business where there is an abandoned ship.  They were there for an hour or so, and continued to the Barrio ward of Patillas, making several stops along the way.  At Segunda Unidad ward, they made another stop, for an hour to an hour and a half.  Then they continued to a business next to the Patillas lake, La Playita's Place.  That was the third stop and lasted  45 minutes to an hour.  They then went to El Charco de los Neris and were there from 5:00 to 5:30 P.M.  There were more riders with the group.  Héctor Vélez was there also.  This was the fourth stop, where the group ate.  They were there for two hours.  They rested, and socialized with the others that had joined

CRIMINAL 06-0265 (JAG)                11

the group.  Then they returned following the same direction.  They stopped in the La Playita Restaurant, for an hour more or less.  Then they went back to the abandoned ship, and stopped there for approximately two to two and a half hours. They then went to Barriada Marín in Arroyo at about 10:00 to 10:15 P.M.  Héctor Vélez was with the group all the time from beginning to end.  Every time the group made a stop, Mr. Rivera was in charge of distributing the beverages so that those that joined would not drink so that the ones that paid would not be without drinks.  In between stops, Mr. Rivera would see the defendant because  the original group of 12 to 15 people were together.

There were different types of horses.  There were short step (fino) horses, long steps, fine steps, and andadura when the horse is allowed to ride at its own step.  Defendant's horse is paso fino, and therefore cannot be rushed too much. Mr. Rivera is familiar with Road No. 3 and the intersection with Road No. 178 and is familiar with Toñito's car sales.  That dealer is about four kilometers from the Placita where the cabalgata ended, and from there to the Charco Los Neris there are a lot of kilometers.  A horse going non-stop without running would not make it there.  The cars never left the event.

On cross-examination, Mr. Rivera noted that there could have been 25 to 30 people in the cabalgata, or monte, at one time, and that they did not need a permit.  A permit is required when the event is made for profit, and this was a

CRIMINAL 06-0265 (JAG)                12

social event.   Every weekend one can see the horses along those routes. Although Mr. Rivera has ridden a lot, this was the first cabalgata he had ever done.  The group left at about 1:30 P.M. with destination to Barrio Real in Patillas, and they rode about 10 to 15 minutes until they got to the abandoned ship and rested for an hour to an hour and a half.  There were four stops before reaching Barrio Real, and they rested about an hour at each, depending on how the animals were.  From the abandoned boat to the Segunda Unidad, it was fifteen to twenty minutes.  Then they stopped at La Playita Restaurant after twenty to twenty-five minutes, and rested an hour.  Then they proceeded to Barrio Real by way of Charco Los Neris.  That took 30 minutes (it rained a lot).  They then rested there. With the joined persons there were about twenty-five to thirty people.  Mr. Rivera saw the defendant at each stop and he would come to the van to get a drink just like the others did.

Mr. Rivera was previously interviewed by Agents Nitza Delgado and Agent Chu and he told them that he could not account for every single stop of the defendant.  He did not look at the defendant all the time, and  could not keep track of the defendant, but the defendant would come over to get a drink.  He did not remember when he left La Placita, after the group got there at 10:00 PM.

The group stopped a minimum of four times, for one and a half hours each time.  At night on the return, the group stopped three times but the stops were

CRIMINAL 06-0265 (JAG)                    13

not that long.  The group stopped at La Playita for forty-five minutes to an hour and stopped at the abandoned ship for two hours.  They decided to go all the way to the abandoned ship, and at the ship they stayed for two hours, and then they left for La Placita.  Mr. Rivera saw the defendant at 7:00 P.M., and implied that it was impossible for the defendant to ride a paso fino horse to Road No. 3 at the Road No. 178 intersection.  A paso fino cannot do that since the steps are shorter and it takes that horse longer to get to places because such a horse gets tired quicker.

Elizabeth Ramos López, the spouse of the defendant, testified that she lives in the Arroyo sector of Ancones ward, No. 8, and works as a saleswoman at Plaza Guayama Mall.  On August 5, 2006, she went to work which is about a 30 minute drive from her home.  She took her van to work, an F-150 pickup, wine color, at about 7:30 A.M., and arrived there at 8:00 A.M., driving directly.  She parked in the public parking area of the Guayama Mall, and took the key to her work area.  The pickup was not there all day.  At 10:30 A.M., her brother Filomeno Ramos, called her and asked her if he could get the pickup because he was going to go to a junker in Cidra to buy some car parts.  He picked it up at 11:00 A.M.  Ms. Ramos left work at 3:15 P.M. in another vehicle, one left by her brother.  She took that vehicle and went to her mother's house.  She saw her pickup again at 6:00 P.M. on August 5, 2006 at her mother's house, where her brother took the

CRIMINAL 06-0265 (JAG)                    14

vehicle.  From 7:45 to 8:00 P.M., she went to a route where her husband was in

a cabalgata (horseback riding event) since she was familiar with the route.  She

went to see where he was along the route, and reached the group at the area

known as The Ship.  She stayed there 15 minutes speaking with her husband and

then returned to her mother's house.  She arrived there at 8:40 P.M., stayed

there until 9:30 P.M., and then she returned to her home in the pickup at about

9:30 P.M.

On cross-examination, the defendant's spouse noted that her brother came

into the mall to pick up the keys and the vehicle was returned from 5:30 to

6:00 P.M.  At an interview by agents at the sentencing of her son in local court,

she denied being asked questions about the pickup and did not recall saying that

the pickup was in the mechanic at the time.  She was then upset because her son

was being sentenced.

Filomeno Ramos López lives in Arroyo, is a car mechanic, brother of

Elizabeth Ramos, and brother-in-law of the defendant.  On August 5, 2006, he

needed to get some parts in a junker in Cidra for his auto, a Mitsubishi Mirage

1993.  He went to get the parts and needed a big car so he went to his father's

house to see if his sister's van was there so he called her to see if he could borrow

the pickup.  He then called the defendant to borrow the pickup and he said it was

no problem, that his wife had it.  Since her van was being fixed by their father,

CRIMINAL 06-0265 (JAG)                    15

Mr. Ramos took her van at his father's house, so that Ms. Ramos would lend him the pickup, Mr. Ramos retrieved the pickup at 11:00 A.M., picked up the parts in Cidra, then went to Cayey near where he once worked, and then went to Arroyo. Mr. Ramos delivered the parts to the auto body repairman and went to the house again.  His sister was there so he gave her back her pickup at about 5:45 P.M. He did not see the pickup again.

From the mall he went to Willy Auto Junk Yard in Cidra.  He did not have the receipt.  It took him one and two-third to two hours.  He was there 45 minutes to an hour.  In Cayey, before getting a haircut, he visited with his former fellow workers.  He had worked at Esteban Auto Cayey, and former workers Efraín Díaz, and Betty Claudio were there.  He was there two to three hours and had the parts in the pickup.  It took 20 minutes to get from Cidra to Cayey, and he was at the barbershop for 15 minutes.  Then he went straight to his mother's house.  He then went to Las 500 Community, driving there from Guavate, a drive which took 45 minutes.  He stayed there 10 to 15 minutes.  He had no receipt for the parts and had no receipts with him that the car was being repaired that day.  He remained at his mother's house for 25 minutes.

Agent Félix Figueroa Figueroa, badge  21992, testified that he has been a policeman for the Police of Puerto Rico for the last 13 years, and is now assigned to the drugs and narcotics division in the Guayama area and has been there for

CRIMINAL 06-0265 (JAG)                    16

about two years.  Before that, he had worked in other areas for 13 years.  He has been involved in seeking and executing search warrants since 1996.  Looking at Exhibits 1 and 2, he testified that he executed those search warrants.  His involvement consisted in being part of a work plan to execute the two original search warrants.  Sergeant Domingo Ramos gave them to him to execute the warrants on the 9th of August (2006).  The warrant is turned over and executed on the same day it's going to be executed.  Agent Figueroa had never seen the warrants before that day.  He received the warrants, verified them (agent's affidavit, supervisor, judge who signs it and prosecutor who authorizes it).  He did not  discuss the warrant with the attesting officer.  He is supposed to make sure the documents are authentic, and were issued within the last 10 days, with original signatures, and original stamps/seals of the court.  The investigator and supervisor make the decision, and the warrant is executed.  The supervisor tells the executing agents that they are to execute the warrant.  He and a group of officers arrived at the area of Toñito Auto Sales, to search a Ford pickup and a house.  The sergeant gave instructions that he place himself in the area around the dealer to locate the apartment to be searched as well as the vehicle.  At about 1:00 P.M., the Ford pickup arrived in front of the apartment to be searched.  An individual weighing 200 lbs (defendant) arrived wearing a grey polo and blue jeans. He walked to the apartment which was going to be searched,  opened the

CRIMINAL 06-0265 (JAG)                    17

door to the apartment and entered.  Shortly, he came out again, and closed the apartment.  He got into the pickup and Officer Figueroa radioed Sergeant Ramos. Officer Figueroa then saw the pickup come into the same parking lot where he was.  The defendant parked facing Antonino's Pizza in the same parking area where Officer Figueroa was located.  Support units arrived and Officer Figueroa approached the defendant and told him to get out of the vehicle.  Officer Figueroa gave the defendant a copy of the warrants and they searched the vehicle with a canine team.  In the cabin of the vehicle, the dog marked the middle of the dashboard and under the middle, Officer Figueroa immediately seized a medium size bag with marijuana and $34 inside the bag.  Officer Figueroa then arrested the defendant.  Then they entered the apartment to search it, noting Exhibit 3, the inventory of the search.  Once in the apartment, it can be described as a small apartment since this is a motel type building, and there was no furniture to speak of.  There was a laboratory for controlled substances, and based upon his experience, one of the biggest labs he had seen.  In the kitchen, there was no food.  There was equipment for controlled substances.  There were cooking pots with cocaine with crack.  In glass containers used in bake shops, there was residue for cocaine.  Agent Figueroa never spoke to Agent Martínez.

<u>Search Warrant</u>

Before a search warrant issues, the "warrant application must demonstrate probable cause to believe that (1) a crime has been committed–the 'commission'

CRIMINAL 06-0265 (JAG)                18

element, and (2) enumerated evidence of the offense will be found at the place to be searched–the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999); United States v. Zayas-Díaz, 95 F.3d 105, 111 (1st Cir. 1996).

Probable cause means that the totality of the circumstances gives rise to at least a fair probability that a search of the target premises will uncover evidence of the suspected crime. See Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Feliz, 182 F.3d at 86; United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997); United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996); United States v. Jewell, 60 F.3d 20, 23 (1st Cir. 1995); see also United States v. Pérez Velázquez, 488 F. Supp. 2d 82, 90 (D.P.R. 2007). "The task of the issuing [judge] is simply to make a practical, common-sense decision. . . ." New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986).

One must be mindful that there is a traditional respect accorded to warrants and the principle that the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 109 (1965), quoted in Illinois v. Gates, 462 U.S. at 237 n.10.

The evidence squarely presents an issue of credibility which places the testimonies at loggerheads in relation to the August 5 transactions.  The defense

CRIMINAL 06-0265 (JAG)                    19

does not directly address the facts leading to the August 7 observations of Officer

Martínez.  It is clear that the defendant could not be horseback riding with a group

of horseman and conduct drug deals at a distance from the horses, both shortly

after 7:00 P.M. on August 5, 2006.  It is also clear from the evidence presented

that the defendant was on his paso fino elsewhere when the purported

observations took place.  The Ford F-150 pickup was somewhere between Cidra

and Cayey at the time of the observations, according to the preponderance of the

evidence.  Regardless of which side called him for the evidentiary hearing, the

testimony of Officer Martínez is presented with no supporting documentation from

the government in terms of a operational log for confidential calls, or rough notes

of events, or other Fed. R. Evid. 801(d)(1(B) material, this combined with the by

now commonplace testimony of the receipt of an anonymous phone call relating

to a place where drugs are dealt, a police officer on surveillance of the target

property for 5 or 10 minutes when he first witnesses a crime in plain view from

a "strategic location."  There was no speculation of what was being seen in plain

view, marijuana or cocaine, from the strategic location.   The affidavit and

testimony of the officer were carbon copies of each other.  I am asked  to accept

such stereotyped testimony blindly and the fact that the apartment is a dope

factory does not mean that whatever the officer said about the August 5 events

must be true.  The witnesses for the defense, two of whom are related to the

CRIMINAL 06-0265 (JAG)                    20

defendant, are unimpeached, regardless of the defense not bringing toll records or receipts to court.  I do not believe that the August 5, 2006 event occurred as related to the judge issuing the search warrants.  See, e.g., United States v. Pagan, 286 F. Supp. 2d 231 (D.P.R. 2003).   The fact pattern of the first surveillance having been disbelieved, the facts in relation to the second surveillance are found to be equally unreliable.  Officer Martínez clearly identified the defendant on both the August 5 and August 7 surveillances as being the same person.  If I set to one side the information provided in the affidavit based upon the first surveillance, and determine that it did not occur as the officer said it did, because such information is knowingly false, there is insufficient content in the warrant affidavit to support the finding of probable cause.  This is not a simple mistake or negligence; this is a knowing lack of truthfulness.

In view of the above, I recommend that the motion to suppress be GRANTED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further

CRIMINAL 06-0265 (JAG)                    21

appellate review.   See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 17th day of January, 2008.

S/ JUSTO ARENAS
Chief United States Magistrate Judge